On January 9, 1997, Janie Sawyer ("Sawyer"), as the widow and dependent of Bobby Mack Sawyer ("the employee"), sued Kimberly-Clark Corporation, seeking workers' compensation benefits pursuant to § 25-5-60, Ala. Code 1975, following the death of her husband, a former employee of Kimberly-Clark. Sawyer specifically alleged that her husband died of cancer as a result of his exposure to asbestos while employed at Kimberly-Clark. Kimberly-Clark answered and denied liability. Following an ore tenus hearing, the trial court entered a judgment on December 29, 2003, in which it found that the employee died as a result of exposure to asbestos during his employment with Kimberly-Clark and awarded Sawyer death benefits accordingly. Kimberly-Clark timely appealed.
The facts pertinent to the disposition of this appeal are as follows. The employee died of lung cancer on July 8, 1996. A copy of the employee's death certificate admitted into evidence at trial lists the immediate cause of death as lung cancer and the underlying cause of death as cardiopulmonary arrest. Shortly before his death, the employee was screened to determine whether he had asbestosis. The employee requested that screening after viewing a commercial for a free screening; the screening was performed in preparation for a potential lawsuit by the Environmental Litigation Group, a law firm located in Birmingham. Following the screening, the employee was diagnosed with asbestosis by Dr. Michael Conner and was encouraged to seek medical treatment. In May 1996, the employee was diagnosed with lung cancer. Before being diagnosed with lung cancer, the employee had been diagnosed in 1990 with bladder cancer and in 1994 with throat cancer. Although somewhat disputed at trial, there was substantial evidence presented indicating that the employee smoked two packs of cigarettes per day for approximately 40 years.
The employee worked for Kimberly-Clark from January 1, 1968, to May 18, 1996. The employee worked at Kimberly-Clark's Coosa Pines Pulp and Paper Mill ("the mill").[1] During his 28 years of employment with Kimberly-Clark, the employee worked in a number of capacities for Kimberly-Clark. The employee's first position at the mill was that of a laborer; the employee worked in that position for 10 years. The employee next worked as an "airveyor" operator for a little over one year. In his position as an airveyor operator, the employee unloaded salt from rail cars and pumped the salt into salt tanks in the recovery buildings at the mill. The majority of his work as an airveyor operator occurred outside of the mill. In the summer of 1979, the employee began working as a checker. His duties as a checker included taking inventory of materials. Four years later, the employee was promoted to the position of head handler. As head handler, the employee supervised checkers and laborers at the mill. The last position held by the employee was that of receiving leader. In that position, the employee had similar responsibilities to those of a head handler, along with the added responsibility of bookkeeping. *Page 740 
It is undisputed that the mill contained asbestos. The record indicates that the various jobs the employee held with Kimberly-Clark required him to work all over the mill. A list of locations in the mill containing asbestos was admitted into evidence at trial. The locations were listed as follows:
"Power House
 "[First] Floor: Coal mill areas, feed water pump area ceiling, isleway along southside of boilers.
 "[Second] Floor: (Operator level) All steam headers to turbines, all lead lines to these headers, all lines over boiler operators control room (to each boiler).
"Mezzanine: Floor above Power House employee offices.
"Grating floor above 2nd level.
"All line on utility row except new steam loops.
 "Old Pulp Mill, Paper Mill, Recovery # 2 and Bark Boiler
 "All levels of this area have extensive amounts of asbestos. These lines come through the Warehouse into the Old Flat Screen Room through Groundwood into the Papermill. Should be #1, #2, and #3 paper machines on 1st and Operational floors. The air chase between #2 and #3 paper machines also has high levels of asbestos.
 "[Number] 2 Recovery and Bark Boiler have had extensive amount of asbestos removed but still have high quantities of asbestos.
"Groundwood Grinder Room (G.N.)
"Screen Room Basement
"Screen Room Operator Level
"Grinder Room Basement"
Two of the employee's coworkers testified at trial. The first, Joe Shaw, testified that he had worked for Kimberly-Clark for 35 years before retiring in 1992. Shaw testified that the jobs that the employee held at the mill required the employee to work in locations throughout the mill. Shaw testified that asbestos was used for insulation that covered pipes in the mill. He also testified that portions of the mill had walls containing asbestos. According to Shaw, the employee's job duties did not require the employee to work with the asbestos-containing insulation surrounding the pipes. Shaw noted that the employee's jobs as a laborer, checker, and receiving leader placed the employee in the power house, a location containing asbestos.
William Kallenbauch[2] supervised the employee at the mill. Kallenbauch began working for Kimberly-Clark in 1961. Kallenbauch testified that he was aware that asbestos was located in over one-half of the mill. According to Kallenbauch, in the early 1970s, after the federal government created the Occupational Health and Safety Administration ("OSHA"), Kimberly-Clark was asked to identify areas in the mill containing asbestos and to remove the asbestos from those designated areas. Kallenbauch testified that, in the early 1980s, following the completion of a base-line industrial hygiene survey, the asbestos clean-up process commenced at the mill. During the removal process, procedures were implemented to isolate the areas in the mill containing asbestos. According to Kallenbauch, some of the areas could not be effectively isolated because of their location, but, Kallenbauch stated, warnings and instructions were given to employees about those areas. Kallenbauch testified that it was the mid-1990s before the last asbestos was removed from the mill. Kallenbauch further testified that by the time the employee left his employment with *Page 741 
Kimberly-Clark in May 1996, all asbestos had been removed from the paper-mill area of the facility; Kallenbauch was unsure if all of the asbestos had been removed from the entire mill.
Kallenbauch testified that the various jobs held by the employee at the mill did not involve handling or working with products containing asbestos. According to Kallenbauch, it was the sole responsibility of the maintenance department to work with the insulation containing asbestos around the pipes and to address any problems with insulation in the mill. Kallenbauch could not recall any time when the employee had worked in the maintenance department.
Kallenbauch testified that the jobs the employee held at the mill required the employee to work primarily in the old pulp mill, the paper mill, the number two recovery area, and the power house. According to Kallenbauch, the employee worked close to the number two recovery area as an airveyor operator and as a checker. The employee's job responsibilities as a checker included taking inventory of materials around the mill, including the old pulp mill and paper mill. Kallenbauch testified that the employee also worked in the "ground wood grinder" room as a checker.
William Dyson, an industrial hygienist, testified that he investigated whether or not companies and industries complied with OSHA standards. According to Dyson, the monitoring he performed as an industrial hygienist included visiting a number of pulp and paper facilities and, in some cases, testing for asbestos. Dyson testified that he had never been to Kimberly-Clark's Coosa Pines mill and, therefore, had never performed air-monitoring tests at the mill.
Dyson testified that in order to study the effects of asbestos, he looks to the dose-response relationship of asbestos. Dyson noted that this theory is based on the premise that the diseases associated with asbestos are directly related to the amount of exposure. According to Dyson, OSHA prescribes the permissible exposure limits for employees in pulp and paper facilities. In preparation for trial, Dyson reviewed the results of air-monitoring tests conducted by industrial-hygiene personnel for Kimberly-Clark in compliance with OSHA regulations. The results of the air-monitoring tests were admitted as an exhibit at trial. Dyson focused on tests conducted in the areas of the boiler house and the paper mill; he testified that the results of those tests indicated that Kimberly-Clark was complying with OSHA guidelines for permissible limits of exposure to asbestos.
Dyson testified that maintenance employees had an increased risk of exposure to asbestos because of their work with asbestos-containing products. Taking into account the results of the air-monitoring tests and the employee's job at the mill, Dyson opined that, based on his experience, the employee did not work in an environment that presented an asbestos exposure level capable of putting the employee at risk for asbestos-related lung cancer.
Dr. Alan Goldstein, a pulmonologist, testified that he specializes in the area of occupational pulmonary diseases. Dr. Goldstein is certified by the National Institute of Occupational Safety and Health as a "B-reader." Dr. Goldstein's certification as a B-reader allows him to specialize in the reading of chest X-ray films to identify occupational lung diseases.
Dr. Goldstein testified that he is a member of the American Thoracic Society ("ATS"). According to Dr. Goldstein, ATS is an organization of specialists that publishes a journal related to both academic and pulmonary practice. Dr. Goldstein testified that, in 1986, ATS published *Page 742 
guidelines for the diagnosis of asbestosis. According to Dr. Goldstein, the guidelines provided by ATS are generally accepted among pulmonary physicians in the United States as being the standard of diagnosis for asbestosis. Pursuant to ATS guidelines, the standard of diagnosis for asbestosis is as follows: 1) a determination of asbestos exposure, 2) a sufficient latency period, 3) an abnormal chest X-ray, 4) restrictive pulmonary functions demonstrating small lungs, 5) an abnormal diffusing capacity, and 6) the presence of respiratory rales. According to Dr. Goldstein, the presence of rales can only be ascertained by a physical examination.
Dr. Goldstein testified that the employee had been exposed to asbestos and had the appropriate latency period for a diagnosis of asbestosis. Dr. Goldstein reviewed chest X-rays of the employee taken in March 1995, April 1996, and May 1996. According to Dr. Goldstein, the employee's chest X-rays, while abnormal, did not indicate an interstitial disease such as asbestosis but instead showed abnormalities related to lung cancer. Dr. Goldstein testified that he saw no record of pulmonary-function tests performed on the employee, no report of an abnormal diffusing capacity, and no indication of the presence of respiratory rales. Dr. Goldstein opined that, based on the employee's medical records, without the presence of rales, pulmonary-function-test measurements, and evidence of an abnormal diffusing capacity, a diagnosis of asbestosis is not possible. According to Dr. Goldstein, in the absence of asbestosis, a diagnosis of lung cancer cannot be attributed to asbestos exposure.
Dr. Goldstein opined that the employee did not have lung cancer as the result of asbestos exposure. Dr. Goldstein testified that the employee's long history of smoking was directly causative of the employee's development of lung cancer. Dr. Goldstein further testified that the employee's history of bladder and throat cancer was related to the smoking; he could not relate the employee's bladder and throat cancer to the employee's exposure to asbestos.
A report authored by Dr. Phillip Lucas, a B-reader who had read the employee's April 1996 chest X-ray, was admitted into evidence at trial. In his report, Dr. Lucas noted that he had examined the April 1996 X-ray of the employee's chest for "the presence and classification of asbestos related pneumoconiosis." Dr. Lucas concluded in his report that there were "pleural and interstitial fibrotic changes consistent with asbestosis in a patient who has had an adequate exposure history and latent period." Dr. Lucas did not testify at trial.
A copy of the deposition testimony of Dr. Conner, the doctor hired by Sawyer's attorney, was admitted into evidence at trial. Dr. Conner is a pathologist employed at the University of Alabama at Birmingham; his primary focus is in the field of obstetrics and gynecology. In his deposition, Dr. Conner testified that he reviewed the employee's medical records, the employee's personal work history, and a May 1996 report issued by Dr. Lucas. Dr. Conner did not physically examine the employee and was not provided with pulmonary-function-test results on the employee. There is no indication in the record that pulmonary-function tests were performed on the employee. Dr. Conner testified that he diagnosed the employee as having pulmonary asbestosis.[3] According to Dr. Conner, he based his diagnosis of *Page 743 
pulmonary asbestosis on the opinion given by Dr. Lucas in his report.
Dr. Conner testified that the conclusion reached in Dr. Lucas's report indicated that the employee had had long-term exposure to asbestos. Dr. Conner opined that the employee's pulmonary asbestosis was related to his employment at Kimberly-Clark.
When this court reviews a trial court's factual findings in a workers' compensation case, those findings will not be reversed if they are supported by substantial evidence. § 25-5-81(e)(2), Ala. Code 1975. Substantial evidence is "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida,547 So.2d 870, 871 (Ala. 1989). Further, this court reviews the facts "in the light most favorable to the findings of the trial court."Whitsett v. BAMSI, Inc., 652 So.2d 287, 290 (Ala.Civ.App. 1994), overruled on other grounds, Ex parte Trinity Indus.,Inc., 680 So.2d 262 (Ala. 1996). A trial court's legal conclusions, however, are afforded no presumption of correctness, and this court reviews them de novo. Ex parte Cash,624 So.2d 576 (Ala. 1993).
At the outset, we note that Kimberly-Clark contends on appeal that Sawyer filed her claim for workers' compensation death benefits outside the limitations period set forth in § 25-5-117, Ala. Code 1975. Section 25-5-117(a), Ala. Code 1975, governs the limitations period for occupational-disease claims and provides that,
 "[i]n case of death, the claim shall be forever barred, unless within two years after death, if death results proximately from the occupational disease . . . and death occurs within three years of the date of the injury, . . . the parties have agreed upon the compensation under this article, or within two years after death, one of the parties shall have filed a verified complaint as provided in Section 25-5-88."
The "date of injury" is defined as "the date of the last exposure to the hazards of the disease in the employment of the employer in whose employment the employee was last exposed to the hazards of the disease." § 25-5-117(b), Ala. Code 1975.
There is no question that Sawyer filed her claim against Kimberly-Clark within two years of the death of the employee. Therefore, we must determine if the trial court correctly determined the date of the employee's injury and whether the employee died within three years of his injury. Before trial, the parties stipulated that the employee's last day of employment at the mill was May 18, 1996. Sawyer filed her claim against Kimberly-Clark on January 9, 1997. The evidence presented at trial indicated that the employee held jobs that required him to work throughout the mill and that asbestos could be found in over 50% of the mill. Evidence was offered that placed the employee in designated "asbestos locations" in the mill. Further, testimony from Kallenbauch revealed that it was only by the mid-1990s that asbestos was completely removed and that, even then, it was removed only from some areas in the mill. Under these circumstances, we cannot say that the claim for death benefits was time-barred under § 25-5-117(a), Ala. Code 1975.
Kimberly-Clark next contends that the trial court erred in denying its motion in limine to exclude the deposition testimony of Dr. Conner and the report authored by Dr. Lucas. Before proceeding to trial, Kimberly-Clark filed a motion in limine seeking to exclude the medical findings, reports, and opinions of Dr. Lucas and Dr. Conner. Kimberly-Clark argued that the report prepared by Dr. Lucas was inadmissible under Frye v. United *Page 744 States, 293 F. 1013, 1014 (D.C. Cir. 1923) ("Frye"), and that Dr. Conner's deposition testimony and his opinion based on Dr. Lucas's report were, therefore, also inadmissible. The trial court deferred ruling on the motion in limine until after the parties presented evidence at trial, and in its December 29, 2003, judgment, the trial court denied Kimberly-Clark's motion in limine.
We will first address the admissibility of Dr. Lucas's report. Kimberly-Clark argues on appeal that Dr. Lucas's report is inadmissible because it does not meet the general-acceptance standard set forth in Frye. Pursuant to the standard set forth in Frye, "a person who offers an opinion as a scientific expert must prove that he relied on scientific principles, methods, or procedures that have gained general acceptance in the field in which the expert is testifying." Slay v. Keller Indus., Inc.,823 So.2d 623, 626 (Ala. 2001).
At trial, Dr. Goldstein testified that ATS publishes guidelines for the diagnosis of asbestosis that are generally accepted in the field of pulmonary medicine as the standard for the diagnosis of asbestosis in the United States. According to those guidelines, in order to diagnose asbestosis, there must be evidence of 1) exposure to asbestos, 2) a sufficient latency period, 3) an abnormal chest X-ray, 4) restrictive pulmonary function, 5) an abnormal diffusing capacity, and 6) respiratory rales. In his report, Dr. Lucas based his diagnosis of asbestosis on the employee's exposure to asbestos, a sufficient latency period, and an abnormal chest X-ray; he did not address the remaining factors considered in the diagnosis of asbestosis as set forth in the ATS guidelines. Dr. Lucas did not perform a physical exam on the employee.
We recognize that "[a] trial court's decision to admit or to exclude evidence is within its sound discretion, and that decision will not be reversed on appeal absent a showing of an abuse of discretion." Roberts v. Roberts, 802 So.2d 230, 236
(Ala.Civ.App. 2001). However, in the instant case, the report authored by Dr. Lucas and admitted into evidence at trial gives no indication that Dr. Lucas relied on "scientific principles, methods, or procedures that have gained general acceptance" in the preparation of his report. Dr. Lucas, in arriving at his diagnosis, relied on three of the six factors that Dr. Goldstein testified were generally considered in the diagnosis of asbestosis. There is no evidence that Dr. Lucas considered the other three factors, i.e., the results of pulmonary-function tests, the presence of an abnormal diffusing capacity, or the presence of respiratory rales. We find that Dr. Lucas's report did not meet the general-acceptance standard set forth in Frye;
therefore, the trial court exceeded its discretion by denying Kimberly-Clark's motion in limine and admitting Dr. Lucas's report into evidence at trial.
We now turn to the issue of the admissibility of Dr. Conner's deposition testimony. Kimberly-Clark argues on appeal that if Dr. Lucas's report is inadmissible, Dr. Conner's deposition testimony, in which he bases the conclusion that the employee suffered from pulmonary asbestosis on Dr. Lucas's report, is also inadmissible.
The traditional rule followed in Alabama disallows expert testimony based in part on the conclusions or opinions of others.See Chinevere v. Cullman County, 503 So.2d 841 (Ala. 1987). InNash v. Cosby, 574 So.2d 700, 704 (Ala. 1990), however, our supreme court modified the traditional rule to allow a medical expert to give opinion testimony "based upon medical or hospital or psychological records, even in some cases where those records are not in evidence." Shortly after its decision in Nash, the supreme court clarified its decision in that case by stating that its holding in *Page 745 Nash "has not changed the traditional rule followed in Alabama that the information upon which the expert relies must be in evidence." Ex parte Wesley, 575 So.2d 127, 129 (Ala. 1990) (footnote omitted). In Wesley, the supreme court noted:
 "In Nash we recognized that `the recent trend has been toward allowing expert testimony that is based upon medical or hospital or psychological records, even in some cases where those records are not in evidence.' 574 So.2d at 704. (Emphasis added.) There, the records upon which the expert partially based his testimony were in evidence. Our recognition of the recent trend, however, is not to be taken as an adoption of that trend, especially considering that the facts in Nash would not support our doing so. Accordingly, the phrase `even in some cases where those [medical] records are not in evidence' should be given no significance insofar as the law of this state is concerned."
575 So.2d at 129 n. 1.
Our review of Dr. Conner's deposition testimony reveals that he based his diagnosis of pulmonary asbestosis on Dr. Lucas's report and the conclusions reached in that report; the report served as the main basis for his opinion testimony. Dr. Conner, who is not certified as a B-reader, did not review the employee's chest X-ray but relied solely on Dr. Lucas's report in forming his medical opinion. Given our determination that Dr. Lucas's report was inadmissible, Dr. Conner's reliance on that report in formulating his expert, medical opinion concerning the employee's diagnosis, and the rule in Alabama that provides that information relied on by an expert must be in evidence, see Nash, supra, and Wesley, supra, we must hold that the trial court erred to reversal in admitting Dr. Conner's deposition testimony.
We pretermit discussion of the remaining issues on appeal and remand this case to the trial court for a determination of liability in light of our holding that Dr. Lucas's report and Dr. Conner's deposition testimony are inadmissible.
REVERSED AND REMANDED WITH INSTRUCTIONS.
YATES, P.J., and CRAWLEY, PITTMAN, and MURDOCK, JJ., concur.
[1] The record indicates that Kimberly-Clark sold the mill in 1997 to U.S. Alliance.
[2] The trial court's judgment spells this name Kallenbach; it is unclear from the record and briefs on appeal which spelling is correct.
[3] Dr. Conner defined pulmonary asbestosis as an interstitial restrictive lung disease that is a result of prolonged exposure to asbestos fiber.