COTTE et al. v. SANDS et al.

(Court of Appeals of District of Columbia. Submitted April 14, 1924. Decided May 5, 1924.)

No. 4052.

1. Trusts ☞210—Evidence held not to show contracts were for trustees' benefit.
   In a suit by purchasers of land under agreement that vendors were to grow a commercial apple orchard on each plot sold, evidence *held* not to show that agreement was for benefit of trust company holding legal title until payment of all installments.

2. Trusts ☞104—Funds must be obtained and withheld in violation of duty, to be impressed with constructive trust.
   Before a constructive trust can be impressed on funds which came into possession of trust companies, it must appear that the funds were obtained and withheld in violation of their duty to plaintiffs.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**3. Trusts ⬤⇒210—Trust company, holding title until payment of installments, under no duty to see that vendor developed lands according to their contracts.**

In a suit by purchasers of land under agreements that vendors were to grow a commercial apple orchard on each plot sold, trust company, holding title until payment by purchasers of all installments, *held* under no duty to purchasers to see that lands were developed according to contracts.

**4. Trusts ⬤⇒203—Title "trustee" held to put public on notice as to equitable ownership.**

Title "trustee" is not a mere discriptio personæ, but signifies a legal status, putting the public on notice as to equitable ownership.

Appeal from the Supreme Court of the District of Columbia.

Action by Sara E. Cotte and others against Tucker K. Sands, as receiver of the United States Trust Company, and another. From a decree dismissing the bill of complaint, complainants appeal. Affirmed.

Charles F. Carusi and Hayden Johnson, both of Washington, D. C., and Edgar Allen Poe, of Baltimore, Md., for appellants.

Charles A. Douglas, Bates Warren, and William H. Sholes, all of Washington, D. C., for appellees.

Before ROBB and VAN ORSDEL, Associate Justices, and BARBER, Judge of the United States Court of Customs Appeals.

VAN ORSDEL, Associate Justice. This appeal is from a decree of the Supreme Court of the District of Columbia, dismissing the bill of complaint, filed October 13, 1917, by Sara E. Cotte and some 245 others, named as plaintiffs, suing on behalf of themselves and others similarly situated, who, it is alleged, number about 1,500 persons, in which they pray for an accounting and for a money decree against defendant trust companies for the amount found due.

[1] In 1910 a copartnership, known as F. Mertens' Sons, hereafter for convenience called "the Mertens," was the owner of between 13,000 and 14,000 acres of land at Green Ridge, Allegany county, Md., which they desired to subdivide into 10-acre lots, clear 5 acres of each tract, plant apple trees thereon, not less than 50 trees to the acre, and sell the tracts to the public. In addition to the tract, each purchaser was to receive a residence lot in the town site of Green Ridge containing 10,000 square feet. Under the contracts the purchasers were to make a cash payment and deliver promissory notes for the balance of the purchase price, running over a period of five years. For the purpose of raising money for the initial expense of clearing the land, building roads, purchasing, planting, and cultivating the apple trees, and other necessary expenses, they applied on June 25, 1910, to the United States Trust Company, of Washington, D. C., for a loan of $50,000. This led to the conveyance of the entire tract to the United States Trust Company under date of April 17, 1911. The deed was recorded in Allegany county, Md.

At the time of the execution of the deed, a trust agreement was entered into by the Mertens and the United States Trust Company, under which the trust company was to loan the Mertens $50,000, to be secured by the notes of future purchasers of orchard tracts. The trust

company was to receive fees and commissions for acting as trustee, and it was provided that the trust company should not be bound by any statements or representations made by any person or persons whatsoever, not contained in letters or literature pertaining to the property signed by it, and that the Mertens and their employees or agents should not be deemed in any sense or to any extent the agents of the trust company. The trust company reserved, under this contract, the right to require purchasers, before receipt of payments by it, or before executing a deed of conveyance, to sign a waiver of any claims against the trust company on account of any statements or representations that might have been made with reference to the property purchased.

Contemporaneously with the agreement, a letter was issued by the trust company, to be used by agents in negotiating with intending purchasers, which set forth the transfer of the entire property from the Mertens to the trust company as trustee, and certifying to the high financial standing of the Mertens and their intention "to convert most of this acreage into a modern commercial apple orchard, and dispose of the same to individual purchasers in tracts of convenient size, and to such purchasers this trust company will execute deeds upon payment of purchase price." The letter further stated that the trusteeship was designed to safeguard the purchaser, and that before accepting the trust the trust company caused an examination of the land to be made "by a most successful apple grower of long experience, and we believe that the character of soil, elevation, and climatic conditions all contribute to the making of an ideal location for raising high grade apples."

The agreements with the purchasers were each in the form of a letter, addressed by the purchasers to the Mertens, the material parts of which, are as follows:

"I hereby agree to purchase and do purchase, subject to your acceptance, * * * five acres of land already planted, or to be planted by you during the planting reason of 1911–12. Comprising a five-acre commercial apple orchard, planted fifty trees to the acre, which you are to take care of and cultivate for me for a period of five years from this date, without additional cost.

"You are to deliver to me at the expiration of five years a five-acre commercial apple orchard, each acre thereof containing not less than fifty trees. * * * In the town site of Green Ridge, subject to the town-site restrictions, the following property: One residence lot, in size 10,000 square feet. * * * For value received, and in consideration of your promise and agreement to have transferred and conveyed unto me by warranty deed all of the foregoing described property, such title to be conveyed to me upon full payment of the purchase price herein agreed, I hereby promise and agree to pay to the order of the trustee, namely, the United States Trust Company, of Washington, D. C., as full purchase price, the sum of sixteen hundred dollars ($1,600.00).

"Herewith I hand you the first payment of one hundred and fifty dollars payable to the United States Trust Company, of Washington, D. C., and the balance of the purchase price, namely, fourteen hundred and fifty dollars, I promise and agree to pay to the United States Trust Company, of Washington, D. C., and I herewith give my series of notes for the said balance payable to the United States Trust Company, of Washington, D. C.

"It is hereby agreed that if any of the payments upon the notes hereinbefore mentioned shall be in default for a period of ninety days, then all

money paid shall be forfeited to you, and that this contract shall be null and void, and that you shall then be authorized, without notice, to repossess the property herein agreed to be purchased by me, as fully and to the same extent as if this agreement had not been made, and no money had ever been paid hereunder."

A reservation of the power of agents or representatives to bind the trust company by any conditions not embraced in the contract is reserved as follows:

"It is further hereby agreed and understood that the parties hereto shall not be bound by any statements, agreements, or representations not herein contained, and no representative of F. Mertens' Sons, or of the United States Trust Company, is authorized to change or alter any of the terms of this agreement. Furthermore, I have no written or verbal understanding of any sort that conflicts in any way with this agreement.

"Signature: John Gass,

"Address: 600 Hastings Street, Pittsburgh, Pa.

"Accepted:          F. Mertens' Sons,

"By F. Mertens.

"Cumberland, Md., Oct. 31, 1911.

"Accepted:          United States Trust Co.,

"By C. W. Warden, Vice President."

Some 2,000 tracts of land were sold to purchasers living in various parts of the country, and pursuant to the agreement between the Mertens and the trust company all cash and notes received by the trust company, under these contracts, were immediately indorsed and delivered to the Mertens, the owners. These notes were used by them as collateral security for their own notes in obtaining loans from different banks throughout the country.

By September 7, 1912, the United States Trust Company had made advances from time to time to the Mertens in a sum aggregating $216,-000. On this date the Mertens, desirous of borrowing an additional $100,000 "for the purpose of improving all the property already conveyed," gave their promissory notes and entered into a contract providing that the money should be advanced in installments. As collateral security for this loan, the Mertens indorsed and delivered to the trust company a large number of the notes, which the trust company had received on the purchase price of orchard tracts, and which had been previously indorsed over to the Mertens. By July, 1914, over 2,000 contracts for orchard tracts had been made, and notes given aggregating over $2,000,000, all of which had been indorsed by the trust company to the Mertens.

Between 1912 and 1914 the Continental Trust Company, appellee, loaned Mertens $80,500 "for the specific purpose of improving the orchard properties." In November, 1913, the United States Trust Company went into liquidation, and in July following the trusteeship was taken over by the Continental Trust Company. Before taking over the trusteeship, the officers of the trust company examined the lands and investigated the property, as to whether it would be feasible to accept the trusteeship and advance Mertens a loan of $247,000. This was finally agreed upon, and out of the proceeds the existing loan of $80,500 was liquidated and paid in full. Under the contract accepting the trust, the trust company was to take title to the land, indorse the notes that were sent in from purchasers without recourse to the Mer-

tens, with the further provision that the trust company should not be responsible for the care and cultivation of the orchards.

Simultaneously with the change of trusteeship the United States Trust Company, the Continental Trust Company, and the Mertens advised existing tract purchasers, who had not received deeds, of the change in trustee. The letter sent out by the Continental Trust Company advised the purchasers that the trusteeship heretofore vested in the United States Trust Company had been transferred to it, which the letter recited would—

"handle the business pertaining to the trusteeship in strict accordance with the letter and spirit of existing contracts."

The letter also recited that:

"from inspections made at various times by several of our officers and directors, we believe that the property and its growing apple trees are having judicious and intelligent care."

It should be remembered, however, that this letter was only sent to existing purchasers, and not to persons who thereafter purchased under the trusteeship of the Continental Trust Company. It further appears that the purchasers' notes turned over by the United States Trust Company to the Continental Trust Company were only such as were in the possession of the United States Trust Company and held by it as collateral for the Mertens' notes; the remainder of the purchasers' notes having been hypothecated by the Mertens in banks throughout the country as security for money borrowed.

It further appears that the maximum credit accorded the Mertens by the Continental Trust Company was $247,000, and the largest amount of purchasers' notes at any time held by it was $302,232. In October, 1916, shortly before the Mertens went into bankruptcy, they owed the Continental Trust Company a balance of $150,250, and at the time of the bankruptcy the purchasers' notes received from the United States Trust Company and held by it as collateral, had all been paid excepting about $80,000. These details of collateral payments and indebtedness are unimportant as bearing upon the general question of the liability of the Continental Trust Company, but are recited merely for the purpose of showing the course of procedure between the assumption of the trust by that company in 1914, and the failure of the Mertens in 1917.

From the foregoing it appears, we think, that the method of dealing with the purchasers of lands by the trust companies is clearly disclosed. The contracts of purchase were made between the purchaser and the Mertens. The notes were made payable originally to the order of the United States Trust Company, and later to the Continental Trust Company, and were turned over to the trust company by Mertens or by the salesmen. A record was made by the trust company of the sale and an identification stamp was placed upon the notes. The notes were indorsed by the trust company and with cash payment turned over to the Mertens to whom they belonged. The record discloses that the notes received from sales by the Continental Trust Company were in no instance retained by it as collateral. Its collateral consisted wholly of purchasers' notes taken over from the original trustee.

It is averred and admitted that in 1917 the Mertens became bankrupt and were unable to complete the enterprise. It is charged that the trust companies assumed a trust relationship with the purchasers, which required them to exercise a reasonable degree of care, diligence, and supervision over the expenditure of the moneys paid by purchasers, and to see that they were applied to the care and cultivation of the orchard tracts, and that by the failure of the trust companies to so perform their duties the enterprise proved almost a total failure, to the great damage of the purchaseers, for which the trust companies should be held responsible.

The proof establishes that the plan was originally devised by the Mertens and prosecuted for their benefit, and fails to disclose that the plan was devised in any respect for the benefit of the trust companies. While the United States Trust Company agreed to loan the Mertens $50,000 to be secured by the notes of future purchasers, this, we think, amounted to nothing more than a legitimate loan secured by proper collateral. It in no respect enlarged the trust company's trusteeship in respect of this property. The trusteeship was limited merely to the receiving of the cash and notes and the execution of title when full payment should be made. Of this the intending purchaser had full notice in his contract of purchase. In other words, the trust company became a mere conduit for the convenient disposition and sale of the lands. The evidence discloses nothing from which an enlargement of the liability of the trustee can be extended beyond the express language of the trust agreement which is substantially expressed in the contracts of sale.

[2, 3] Nor is there merit in the contention of counsel for plaintiffs that, owing to the circumstances and conditions under which the funds came into the possession of the trust companies, they were impressed with a trust in favor of the purchasers. Before a constructive trust can be impressed upon the funds which came into the possession of the trust companies, it must appear that the funds were obtained and withheld by them in violation of their duty to the purchasers. This was not the case. They did with the funds and notes exactly what their trusteeship called for, and what the contracts required them to do. No funds or notes remained in their possession. No duty was imposed upon them, but to receive the money and notes and pass them on to the owners. There were no circumstances or conditions from which it could be even inferred that the trust companies owed a duty to the purchasers to see that the lands were developed according to the contracts between tthe Mertens and the vendees.

Anglo-American Savings & Loan Association v. Campbell, 13 App. D. C. 581, relied upon by counsel for plaintiffs, is not in point. In that case the owner of property desirous of erecting a building thereon borrowed $46,500 from a building association for the purpose of erecting the building. The loan was to be advanced in installments at different stages of the construction, and the buildings were to be erected at that cost. The association retained $3,000 of the loan, and the suit was by one furnishing labor and materials to impress a constructive trust in his favor upon the funds held by the loan company. The court, in sustaining the contention of the plaintiff, said:

"The written contract with Campbell shows the times of his payments corresponding with those of the advances to be made to Lea [the owner]. They knew the details of the loan contract and say that they relied upon it as the basis of the credit extended to Lea. That they did so, and did not rely upon the individual capacity of Lea, or their right to a last lien upon the premises, is supported by every reasonable inference deducible from the surrounding circumstances. Lea was engaged in building upon land for which he had not paid, and that was under mortgages to secure at least two-thirds of the purchase money. The existence of these mortgages emphasized the incapacity of Lea to build without a prearranged loan that was attested by the contract with the association for the express purpose of building."

The court in that instance was satisfied from the testimony that Campbell extended credit to Lea upon full confidence that his claim for labor and materials would be paid out of the loan, and it was upon this theory that the court sustained the action. Here there was no money to come into the hands of the trust companies impressed with such obligation as that found to exist in the Campbell Case.

Nor do we think that any additional liability was incurred by the Continental Trust Company under its letter of July 20, 1914, notifying the purchasers of the transfer of the trusteeship from the United States Trust Company to the Continental Trust Company, in which the trust company not only vouched for the high responsibility and business standing of the Mertens, but expressed it as the belief of a number of officers and directors of the company, from inspection made, that the—

"growing apple trees are having judicious and intelligent care along modern horticultural lines."

The letter also assured the purchasers that:

"We will handle the business pertaining to the trusteeship in strict accordance with the letter and spirit of existing contracts, and assure you of careful, punctual, and responsible fiduciary service."

The evidence discloses that, on the date when the Continental Trust Company became trustee, the development of the orchards had progressed, and was progressing, in accordance with the obligations of the vendors as set forth in the contracts of purchase. We think that the assurance of the trust company that the letter and spirit of existing contracts would be carried out relates merely to the obligations assumed by the trust company as set forth in its trust agreement, and of which the purchasers had notice in their contracts. It also appears that at this time there was nothing to indicate that the Mertens, who were engaged extensively in various business enterprises in different parts of the country, were financially in straitened circumstances. There is nothing in the record to disclose any failure on the part of the trust companies to carry out their duties as trustee to the fullest extent assumed by them. Nor is it important that extravagant representations may have been made by the agents of the Mertens to the purchasers, in the way of large numbers of expensive pamphlets and personal representations to induce the public to invest in the enterprise. There is nothing to show that the trust companies either participated in or knew of the methods adopted by the Mertens or their salesmen to induce investment. On the contrary, the purchasers were notified by

the terms of the contract that the trust companies would not be liable for anything not therein stipulated.

The present case is closely analogous to the case of White v. New Orleans Lake Shore Land Co. (C. C. A.) 269 Fed. 937. In that case the land was sold under contracts in terms exactly the same as here. The scheme was the same, except that there it called for orange groves; here, for apple orchards. The only legal distinction consists in the conveyance of the land to the trust company. Here it was an absolute conveyance, without reference, in the conveyance, to the trust relation, while there the deed recited that the trust company held the land "as trustee under the terms of a trust agreement between the parties." It also appears that:

"The terms of the trust were set out in the resolutions, which were referred to in the act of sale as a part thereof, and attached thereto."

This the court held—

"to fully charge plaintiff [purchaser] with notice of the trust relation of the trust company, especially where the plaintiff dealt with it as a trustee of the property."

In the present case the trusteeship is not only referred to in the contract itself, but in letters from the trust companies to the purchasers both before and after purchase. We think the notice of the trust relation of the trust companies was quite as potent as in the White Case.

[4] The title "trustee" is not a mere descriptio personæ, but signifies a legal status which is sufficiently significant to put the public on notice. It is generally held that one dealing with a person or corporation purporting to act as a trustee is put upon inquiry as to the extent and scope of the trusteeship. It imposes the duty of investigation as to the equitable ownership before dealing with property over which such person or corporation assumes to exercise control. Geyser-Marion Gold Mining Co. v. Stark, 106 Fed. 558, 45 C. C. A. 467, 53 L. R. A. 684; Sternfels et al. v. Watson et al. (C. C.) 139 Fed. 505; Shaw v. Spencer, 100 Mass. 382, 97 Am. Dec. 107, 1 Am. Rep. 115; Swift v. Williams et al., 68 Md. 236, 11 Atl. 835.

The decree is affirmed, with costs.