On Application for Rehearing
This court's opinion of December 30, 2003, is withdrawn, and the following is substituted therefor.
This is an appeal from a judgment entered by the Franklin Circuit Court in favor of Barbara Jean Taylor, the employee, and against VF Jeanswear d/b/a The Lee Company, the employer, in a workers' compensation case. *Page 1004 
Taylor had worked for VF Jeanswear for 17 years as an inseamer when she first complained of pain in the base of her right thumb in June 1997. She consulted Dr. Lloyd C. Dyas, an orthopedic surgeon; the surgeon saw evidence of sclerosing tenosynovitis, a hardening and inflammation of a tendon sheath, and he recommended a course of anti-inflammatory medication as treatment.
In October 1997, Dr. Dyas again examined Taylor and noted "a prominence of the CMC [carpometacarpal] joint of the right thumb with positive grind test typical of CMC arthritis." Dr. Dyas confirmed this diagnosis of degenerative arthritis by X-ray, and he prescribed another medication for Taylor. Taylor was to consult Dr. Dyas again in six months, but the record does not indicate if Taylor kept that appointment.
In June 1999, Taylor consulted Dr. William P. Bryant, another orthopedic surgeon, because she was still having pain in her right thumb. Dr. Bryant confirmed Dr. Dyas's diagnosis of degenerative arthritis in the CMC joint. Because the more conservative treatment had not alleviated her symptoms, Dr. Bryant performed a surgical procedure known as "interpositional arthroplasty" on Taylor's right thumb. Taylor continued to see Dr. Bryant for follow-up treatment throughout the remainder of 1999.
In February of 2001, Taylor sought treatment for her left thumb from Dr. Bryant. Dr. Bryant diagnosed Taylor with the same degenerative arthritis in the CMC joint in her left thumb from which she had suffered in her right thumb. Dr. Bryant subsequently performed interpositional arthroplasty on Taylor's left hand on March 15, 2001; Taylor saw Dr. Bryant for follow-up treatment through August 2001.
In a follow-up visit on July 9, 2001, Dr. Bryant placed temporary work restrictions on Taylor. Dr. Bryant subsequently released Taylor to full-duty work, without restriction. She continued to work at the VF Jeanswear plant until it closed in January 2002. At some point, Taylor's job duties changed from those of inseamer to those of "upgrader," then to those of working on the "mod line," and finally, at the time the plant closed, to those of pulling fabric and making tickets. Only the job of pulling fabric and making tickets was not a production-line sewing job. Taylor has been unemployed since the plant closed in January 2002.
Taylor sued VF Jeanswear seeking workers' compensation benefits. Taylor alleged that she had suffered "a severe injury to both her hands as a result of repetitive use." Following proceedings in which the trial court received evidence ore tenus, the court entered a judgment on May 7, 2002, finding as follows:
"FINDINGS OF FACTS
 "1) Barbara Jean Taylor is a 55 year old female who finished the tenth grade in high school. She obtained her GED at the age of 39 and has had no further educational training.
 "2) Barbara Jean Taylor has worked in the sewing industry since September 17, 1979. Although she has worked in various capacities within that industry, she has had no other training in any other line of work.
 "3) Ms. Taylor worked as an inseamer for approximately 17 years, which necessitated extensive use of her hands and thumbs in pushing the work through the sewing machine. Ms. Taylor began having physical problems with her right thumb in June, 1997. *Page 1005 
 "4) Following surgery on her thumb, Ms. Taylor's job changed and she no longer worked as an inseamer. She worked on the mod-line for approximately one year and upgrade until the close of the plant in January, 2002. While the change in job responsibilities may have . . . lessened the demand on her hands and thumbs, she also suffered a reduction in income. However, Ms. Taylor did work, without doctor's restriction, until the plant closed.
 "5) Plaintiff, Barbara Jean Taylor, was diagnosed with CMC disease and surgery was performed on June 18, 1999. She continues to suffer from an arthritic condition which is causally connected, both medically and legally, to her employment with VF Jeanswear d/b/a The Lee Company.
 "6) This Court expressly finds that Ms. Taylor's disablement was caused by an occupational disease that occurred within the line and scope of her employment with Defendant, VF Jeanswear d/b/a The Lee Company. The Court further finds that the disablement has resulted in a vocational disability of 60%."
(Emphasis added.)
In reviewing pure findings of fact, the finding of the circuit court shall not be reversed if that finding is supported by substantial evidence. Our Supreme Court has defined "substantial evidence" as "`evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.'"Ex parte Trinity Industries, Inc., 680 So.2d 262, 268 (Ala. 1996) (quoting West v. Founders Life Assurance Co. of Florida,547 So.2d 870, 871 (Ala. 1989)).
Article 4 of Alabama's Workers' Compensation Act addresses "Compensation for Occupational Diseases." See Ala. Code 1975, §25-5-110 through -123. Section 25-5-110(1) of that Article explains what elements must be shown for a disease to be deemed an "occupational disease" and therefore to be compensable as would an injury by "accident" under Article 3 of the Act, see §25-5-111. The employer does not contest the treatment by the trial court of Taylor's injury as a "disease," thus subjecting the issue of its compensability to analysis under Article 4 and §25-5-110, as opposed to an "injur[y] which [has] resulted from [a] gradual deterioration or cumulative physical stress disorder" (§ 25-5-81(c)), the compensability of which would be governed by Article 3 of the Workers' Compensation Act, Ala. Code 1975, §§ 25-5-50 through -93, including § 25-5-81(c), Ala. Code 1975 (requiring proof of such an injury to be made by "clear and convincing" evidence). No issue is presented to this court on appeal, therefore, as to whether this treatment was appropriate.See McLemore v. Fleming, 604 So.2d 353 (Ala. 1992).
In fact, on appeal the employer relies on the definition pertaining to occupational diseases in § 25-5-110 and proceeds to analyze Taylor's condition under that provision. Specifically, the employer argues that Taylor's condition did not result from a hazard "in excess of those ordinarily incident to employment in general" and "different in character from those found in the general run of occupations." See § 25-5-110, Ala. Code 1975. We have carefully reviewed the evidence before us, including the medical records, the testimony of a vocational expert presented by Taylor, and the testimony of Taylor, herself, and find that the record does contain substantial evidence from which the trial court reasonably could have concluded that Taylor, in her job as a sewing-machine operator for almost 20 *Page 1006 
years, was exposed to conditions, particularly in relation to the use of her thumbs, that were more hazardous than those ordinarily incident to employment and that were peculiar to her occupation as a seamstress. See § 25-5-110(1), Ala. Code 1975.
Secondly, notwithstanding the treatment of Taylor's injury as an occupational disease, the employer cites to § 25-5-81(c), Ala. Code 1975, and argues that Taylor's injury is one that "resulted from gradual deterioration or cumulative physical stress disorders" and therefore should be deemed compensable "only upon a finding of clear and convincing proof that [her] injuries arose out of and in the course of [her] employment." The employer argues that there was not sufficient evidence for the trial court to be able to conclude that the clear and convincing standard was met. Again, we disagree.[1]
Based on our review of the record, we conclude that the inferences as to causation drawn by the trial court from the evidence were reasonable and within the discretion afforded to the trial court in cases such as this. Mindful of the fact that "[t]his court is precluded from weighing the evidence presented before the trial court" and that "[w]e merely examine the record to determine if the conclusion of the trial court is reasonably supported by the evidence, and, if so, whether the trial court has drawn the correct legal conclusions therefrom," Fryfogle v.Springhill Mem'l Hosp., Inc., 742 So.2d 1255, 1257
(Ala.Civ.App. 1998) (citations omitted), aff'd, 742 So.2d 1258 (Ala. 1999), we find no error in the trial court's conclusions in this regard.
The employer also argues that the record does not contain substantial evidence from which the trial court could have concluded that Taylor was 60% disabled. In the written report of Thomas Elliott, the vocational expert retained by Taylor, however, Elliott opined that Taylor was 60 to 65% disabled and explained the basis for his opinion as follows:
 "[Taylor] began her employment with H.D. Lee, which later became VF Jeanswear, in September, 1979. Prior to 1999, she worked as a sewing machine operator as a seam setter on jeans. She stood to perform this work her last two years as seam setter; prior to then, she sat. The work required using both hands to lift two panels of jeans and then guide/push the material with the thumbs into folder, with the panels then seamed together. She typically completed 40 bundles per day, with 34 pair per bundle. With this production based work, she had earnings ranging from $12.50 to $15.00 an hour, working 40 hrs. a week. After the right thumb surgery, she bid on easier job of seam work which required shorter seam and involved less production. She performed this work for approximately one year, earning $8.00 an hour, 40 hrs. a week. She has since worked inspecting/repairing jeans, which required using tag gun, scissors to clip threads, and folding of *Page 1007 
the garment, and with which work she injured her left thumb; bagging, banding, and making label/tickets; then her last job, which she performed for 6 months prior to the plant closing, of entering data into computer to print ticket for garment size and style. She was earning $8.52 an hour with this work, working 40 hrs. a week."
(Emphasis added.)
At trial, Elliott reiterated in his testimony the fact that Taylor, before her right-thumb injury, had earnings ranging from $12.50 to $15.00 an hour, explaining again that this was the starting point for his estimate of a 60% loss of earning capacity. At no time during trial did the employer introduce any evidence disputing the preinjury earnings upon which Elliott based his opinion.
On the other hand, in order to arrive at a 60 to 65% loss of earning capacity, Elliott compared Taylor's preinjury earning capacity of $12.50 to $15.00 per hour to a postinjury earning capacity of only $5.15 to $5.75 per hour. The basis for Elliott's conclusion that Taylor had experienced a 60 to 65% loss of earning capacity is capsulized by the following statement in his written report, "The plant has since closed. [Taylor] is now reduced to looking for jobs that will pay from $5.15-$5.75 an hour." With the exception of this one statement in Elliott's written report, however, there is no evidence in the record that Taylor's earning capacity at the time of trial was limited only to jobs paying $5.15 to $5.75 per hour.
To the contrary, the evidence is undisputed that, at the time the plant closed in January 2002, Taylor was making $8.52 per hour. Moreover, from the time the injury to her right thumb manifested itself in 1997 until the closing of the employer's plant, a period of over four years, Taylor consistently earned from $8.00 to $8.62 an hour. Furthermore, Taylor herself testified that at the time of the plant's closing, she was working approximately 50 hours per week.[2] Based on the record before us, therefore, we do not find substantial evidence that Taylor suffered a loss of earning capacity as much as 60%, and to that extent the trial court's judgment is reversed.
Finally, the employer argues that the trial court erred in awarding permanent partial disability benefits dating back to June 13, 1997, the date the employer was notified of the onset of Taylor's injury. We agree. It is well established that an employee is entitled to begin receiving permanent disability benefits under our Workers' Compensation Act at such time as the employee reaches maximum medical improvement. See, e.g., Exparte Phenix Rental Center, 873 So.2d 226 (Ala. 2003). It does not appear that the trial court in the present case applied this rule in making an award of benefits to Taylor. In this respect, the trial court erred; on remand, the trial court should determine the date on which Taylor reached MMI and adjust the award of benefits accordingly.
That portion of the trial court's judgment determining that Taylor's injuries were compensable under our Workers' Compensation Act is affirmed. The trial court's judgment is reversed with respect to the court's determination of the degree of Taylor's disability and its award of permanent partial disability benefits dating back to June 13, 1997, and this cause is remanded for the entry of a judgment consistent with this opinion. *Page 1008 
APPLICATION OVERRULED; OPINION OF DECEMBER 30, 2003, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
YATES, P.J., and CRAWLEY, THOMPSON, and PITTMAN, JJ., concur.
[1] The employer does not suggest on appeal that, in light of the trial court's treatment of Taylor's injury as an occupational disease, it failed to even apply the clear and convincing evidence standard in determining whether Taylor's injury arose out of and in the course of her employment. Indeed, both the employer and the employee treat this issue in their respective briefs on appeal as if that was, in fact, the standard applied by the trial court. We are therefore not presented with an argument that the trial court failed to apply the clear-and-convincing-evidence standard and, if it did fail to apply that standard, that such failure was error. See McLemorev. Fleming, 604 So.2d 353. The employer's only argument in relation to the "clear and convincing" standard is that there was not sufficient evidence from which the trial court could conclude that that standard was met. Our opinion is limited accordingly.See id.
[2] We also note that following the surgeries on her thumbs, her physicians eventually returned her to work without any restrictions. The evidence also indicated that, for extended periods, Taylor has gone without needing any prescription or other pain medication.