THOMAS, Judge.
 

 Charles Atterberry worked as an automobile detailer for Greater Mobile Chrysler-Jeep, Inc. (“the employer”),
 
 [1]
 
 from April 2005 until he was hospitalized on February 18, 2007, suffering from severe respiratory distress. During the time that Atterberry worked for the employer, he used several detergents and cleaning products containing toxic chemicals, including sulfuric acid, hydrofluoric acid, phosphoric acid, 2-butoxyethanol, and sodium hydroxide. Atterberry was hospitalized for approximately three months and was, at one point, in the intensive-care unit. After his release, Atterberry continued to suffer
 
 *838
 
 from low blood-oxygen levels, requiring the constant use of oxygen and restricting Atterberry’s activities because of his inability to endure much exertion without suffering difficulty breathing.
 

 Atterberry sued the employer, seeking a determination that he was due workers’ compensation benefits as the result of the contraction of an occupational disease or as the result of a nonaccidental injury caused by a gradual deterioration in his condition due to his exposure to hazardous chemicals in his employment. At the time of trial, Atterberry had not yet reached maximum medical improvement (“MMI”), so the only issues before the trial court were whether Atterberry’s illness was compensable under the Workers’ Compensation Act, § 25-5-1 et seq., Ala.Code 1975, and, if Atter-berry’s illness was compensable, what type and amount of temporary benefits were due. The trial court determined, based on what it described as clear and convincing evidence, that Atterberry had injured himself, had suffered a nonaccidental injury, and had contracted an illness; the trial court further concluded that Atterberry’s illness was compensable. Because Atter-berry had not yet reached MMI, the trial court awarded him temporary total-disability benefits and also awarded him costs in the amount of $1,783.92. After its post-judgment motion was denied, the employer sought review by a petition for the writ of mandamus. However, because mandamus review was inappropriate, we treated the mandamus petition as a timely notice of appeal.
 

 Our review of this case is governed by the Workers’ Compensation Act, which states, in pertinent part: “In reviewing pure findings of fact, the finding of the circuit court shall not be reversed if that finding is supported by substantial evidence.” Ala. Code 1975, § 25-5-81 (e)(2). Therefore, this court “will view the facts in the light most favorable to the findings of the trial court.”
 
 Whitsett v. BAMSI, Inc.,
 
 652 So.2d 287, 290 (Ala.Civ.App.1994), overruled on other grounds,
 
 Ex parte Trinity Indus., Inc.,
 
 680 So.2d 262, 269 (Ala.1996). Further, the trial court’s finding of fact is supported by substantial evidence if it is “supported by ‘evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’ ”
 
 Ex parte Trinity Indus.,
 
 680 So.2d at 269 (quoting
 
 West v. Founders Life Assurance Co. of Florida,
 
 547 So.2d 870, 871 (Ala.1989), and citing Ala.Code 1975, § 12 — 21—12(d)). Our review of legal issues is without a presumption of correctness. Ala.Code 1975, § 25 — 5—81(e)(1);
 
 see also Ex parte Trinity Indus.,
 
 680 So.2d at 268.
 

 Atterberry claimed that his illness was an occupational disease or that it was a nonaccidental injury that resulted from gradual exposure over his nearly two-year tenure with the employer. Legal and medical causation in cases involving cumulative-physical-stress or gradual-deterioration injuries must be established by clear and convincing evidence. Ala.Code 1975, § 25-5-81 (c). That statute defines “clear and convincing evidence” as
 

 “evidence that, when weighted against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt.”
 

 The supreme court has recently clarified that appellate review of a judgment based on findings of fact that must be established by clear and convincing evidence is still
 
 *839
 
 governed by the fundamental principle that the appellate court may not reweigh the evidence.
 
 Ex parte McInish,
 
 [Ms. 1060600, September 5, 2008] — So.3d -,-(Ala.2008). As explained by the supreme court’s adoption of a portion of Judge Murdock’s special writing concurring in the result in
 
 KGS Steel, Inc. v. McInish,
 
 [Ms. 2040526, June 30, 2006] — So.3d-,-(Ala.Civ.App.2006):
 

 “ ‘[T]he evidence necessary for appellate affirmance of a judgment based on a factual finding in the context of a case in which the ultimate standard for a factual decision by the trial court is clear and convincing evidence is evidence that a fact-finder reasonably could find to clearly and convincingly [as “clear and convincing” is defined by § 25-5-81(e) ] establish the fact sought to be proved.’ ”
 

 Ex parte McInish,
 
 — So.3d at - (quoting
 
 KGS Steel
 
 — So.3d at - (Murdock, J., concurring in the result)). The supreme court set out the standard thusly, “the appellate court must ... look through a prism to determine whether there was substantial evidence before the trial court to support a factual finding, based upon the trial court’s weighing of the evidence, that would ‘produce in the mind [of the trial court] a firm conviction as to each element of the claim and a high probability as to the correctness of the conclusion.’ § 25-5-81(c).”
 
 McInish,
 
 — So.3d at --.
 

 Atterberry testified that he had worked as an automobile detailer for most of his life, except for a short stint as a sandblaster. According to Atterberry, he began working for the employer in April 2005. At trial, photographs of the two garages Atterberry worked in for the employer were admitted into evidence. Both garages appear similar; however, the second garage, which Atterberry worked in for only a few months before he fell ill, was described as having better ventilation and larger fans.
 

 Atterberry said that he complained to his manager, Lee Barrantine, that the detergents and solvents he was using hurt his lungs and his eyes; Atterberry described the discomfort he suffered as a burning sensation. Atterberry said that Barrantine told him to report his problem to Ted Milanowski, the owner of the company; Atterberry testified that he reported the same information to Milanowski and that he told Milanowski that it was hard to breathe in the garage. According to Atterberry, he noticed the symptoms he complained of most when he was using a particular product, Tiger Super Agent;
 
 [2]
 
 however, he specifically commented that he could not be sure it was not a combination of the products he used that actually caused his illness. Atterberry said that he had sought treatment for respiratory issues during the two years he had worked for the employer; he said that one physician had prescribed Albuterol and that one physician had taken X-rays.
 

 According to Atterberry, he worked the day that he became seriously ill, despite feeling unwell. He said that when he came home after work, he laid down. At-terberry described feeling like he had the flu and explained that his breathing “got bad,” necessitating a trip to the emergency room; he stated that he was told that he had fluid in his lungs. Atterberry was in the hospital for three months. He said that he now uses a nebulizer twice a day and is on oxygen “all day, every day.”
 

 
 *840
 
 Atterberry’s treating physician, Dr. Randy Dotson, a pulmonologist, testified at trial. Dr. Dotson described Atterberry’s condition upon his admission to the hospital; Dr. Dotson said that Atterberry was short of breath, wheezy, and coughing and that Atterberry’s blood-oxygen level was very low. According to Dr. Dotson, the chemicals that Atterberry came into contact with at work, namely hydrofluoric acid and sulfuric acid, are toxic to the lungs; Dr. Dotson testified that those chemicals,
 
 if aerosolized,
 
 can get into the lungs. When asked, Dr. Dotson testified that At-terberry’s exposure to the chemicals at work either caused, contributed, exacerbated, or aggravated Atterberry’s condition, which Dr. Dotson described as some form of restrictive lung disease resulting from some form of interstitial process.
 

 When asked by the trial court whether Atterberry’s condition could be “cured,” Dr. Dotson said that he did not know exactly what condition Atterberry suffered from. Dr. Dotson also said that he could not be sure whether Atterberry suffered from inflammation or fibrosis in his lungs without a biopsy, which apparently had not been performed. On cross-examination, Dr. Dotson said that originally he had not believed that exposure to chemicals had caused Atterberry’s lung condition. However, Dr. Dotson explained that Atterber-ry’s persistent symptoms and his failure to improve as expected had led Dr. Dotson to determine that the chemicals had, in fact, caused Atterberry’s lungs to be more susceptible to the interstitial disease process.
 

 In contrast, Dr. J. Allen Cooper, the employer’s expert, testified in his deposition, which was admitted at trial, that Atterberry’s exposure to the chemicals in the detergents and solvents used during his employment would not have caused or affected Atterberry’s interstitial lung disease. Dr. Cooper had not examined Atterberry, but he had considered Atter-berry’s medical records, his CT scan, his deposition, Dr. Dotson’s deposition, and the Material Safety Data Sheets (“MSDS”) applicable to the chemicals used in the detergents and solvents At-terberry was exposed to during his employment. In Dr. Cooper’s opinion, At-terberry had pneumonia when he was admitted into the hospital. Dr. Cooper concluded that Atterberry’s interstitial lung disease, which Dr. Cooper said was the result of scarring, or fibrosis, in the lower part of Atterberry’s lungs, resulted from the difficulty Atterberry had recovering from pneumonia. Dr. Cooper opined that the chemicals to which Atter-berry was exposed could cause some upper-respiratory-tract symptoms like wheezing if the exposure was to a large volume of the chemicals in a confined, enclosed space. However, according to Dr. Cooper, the chemicals at issue were not soluble enough to reach to the lower part of the lungs.
 

 David Watts, an industrial hygienist, testified on Atterberry’s behalf. Watts said that he had considered affidavits from Dr. Dotson and Atterberry and a report from the Occupational Safety and Health Administration (“OSHA”) and had performed a field assessment at the employer’s garage before forming an opinion regarding Atterberry’s exposure in the present case. Watts admitted that he had not considered the MSDS for the chemicals in the detergents and solvents used at the employer’s garage before forming his opinion; he had, however, reviewed those documents before he testified at trial. Watts testified that many of the chemicals in the detergents and solvents used by At-terberry at work could be hazardous. When questioned about Atterberry’s level of exposure, Watts agreed that Atterber-ry’s exposure to the potentially hazardous chemicals in the performance of his duties
 
 *841
 
 was materially in excess of the exposure of people in their everyday lives.
 

 Watts’s field assessment, however, admittedly did not include any testing of the levels of the chemicals at issue in the detergents and solvents used at the employer’s garage. On cross-examination, Watts agreed that the chemicals at issue were present in many household cleaners used, and even in some food products consumed by, the average consumer. Watts said that he had not tested any of those household cleaners to determine the percentage of the chemicals at issue each contained. On further cross-examination, Watts admitted that Tiger Super Agent contained “on a relative basis” “not a whole lot” of the hazardous chemicals At-terberry complained had caused his illness.
 

 Larry Duff, the owner and operator of S & N Products of Mobile, testified that he sold Tiger Super Agent and other detergents and solvents to the employer and other automobile dealerships and automobile detail shops in the Mobile area. Duff testified that he would mix the Tiger Super Agent himself and that he sold the product in 55-gallon drums. According to Duff, each 55-gallon drum of Tiger Super Agent contained between 45 and 50 gallons of water. Duff explained that he would add the 2-butoxyethanol and the sodium hydroxide by weight and that each drum contained less than five percent of both chemicals by weight.
 

 The MSDS for each of the chemicals contained in the several detergents and solvents used by Atterberry were introduced into evidence, as were MSDS for three specific products, “Tiger Super Agent,” “Aluminum Brite,” and “SuperTuff Degreaser.” The MSDS for hydrofluoric acid states that the substance is “severely corrosive to the respiratory tract”; notably, however, the MSDS reflected data for hydrofluoric acid in its raw form, which is 48-52% hydrogen fluoride and 48-52% water. The MSDS for Aluminum Brite, a product that was used by Atterberry and which contains hydrofluoric acid, does not indicate the percentage of the acid contained in the solution; however, that MSDS does not indicate that Aluminum Brite will cause any respiratory symptoms upon exposure. The MSDS for sodium hydroxide and sulfuric acid indicate that both substances may irritate or cause burns to the
 
 upper
 
 respiratory tract; as was the case with the MSDS for hydrofluoric acid, those MSDS referred to each substance in its pure form, with the percentage of sodium hydroxide listed as 99-100% and the percentage of sulfuric acid being listed as greater than 51% with the balance of the compound consisting of water. The MSDS for both phosphoric acid and 2-butoxyethanol indicate that the risks of inhaling either chemical is low. According to the MSDS for 2-butoxyethanol, “[a] harmful contamination of the air will be reached rather slowly on evaporation of this substance at 20° C,” while the MSDS for phosphoric acid states that “[i]nhalation is not an expected hazard unless misted or heated to high temperatures.” As noted in the testimony, the MSDS for “Tiger Super Agent” indicated that the use of a self-contained breathing apparatus was advised, but only if the “TLV,” or threshold limit value, of the product or any component was exceeded. The MSDS for Tiger Super Agent did not give a TLV for sodium hydroxide and stated that the TLV for 2-butoxyethanol was 50 parts per million. No evidence regarding whether the TLV for any of the components was exceeded when Tiger Super Agent or any other detergent or solvent was being used was presented by any witness or other source.
 

 The employer argues that the evidence does not establish either of the theories
 
 *842
 
 advanced by Atterberry. That is, the employer argues that Atterberry failed to prove either that he had contracted an occupational disease during his employment or that he suffered a nonaccidental injury as a result of his exposure to certain chemicals present in the detergents used in his work as a detailer. We will address each potential basis for the employer’s liability separately.
 

 Whether Atterberry Established that He Had Contracted an Occupational Disease
 

 Atterberry argued at trial that his lung condition was an occupational disease contracted by continued exposure throughout his employment to certain chemicals including sodium hydroxide, hydrofluoric acid, phosphoric acid, sulfuric acid, and 2-butoxyethanol.
 

 “An ‘occupational disease’ is:
 

 “ ‘A disease arising out of and in the course of the employment ... which is due to hazards in excess of those ordinarily incident to employment in general and is peculiar to the occupation in which the employer is engaged .... A disease ... shall be deemed an occupational disease only if caused by a hazard recognized as peculiar to a particular trade, process, occupation, or employment as a direct result of exposure, over a period of time, to the normal working conditions of the trade, process, occupation, or employment.’
 

 “Ala.Code 1975, § 25-5-110(1). The term ‘contraction of an occupational disease’ includes ‘any aggravation of the disease without regard to the employment in which the disease was contracted.’ Ala.Code 1975, § 25-5-110(5).
 

 “To prove the first prong of the legal-causation standard set out in the statute, the employee must prove that the normal working conditions over a period of time exposed the employee to an increased risk of contracting the eomplained-of disease.
 
 See Ex parte Valdez,
 
 636 So.2d 401 (Ala.1994). An employee is exposed to an increased risk if employment conditions elevate the risk of contracting the disease beyond that of the risk faced by the general employment population.
 
 See, e.g., Drummond Co. v. Key,
 
 630 So.2d 473 (Ala.Civ.App.1993); and
 
 James River Corp. v. Mays,
 
 572 So.2d 469 (Ala.Civ.App.1990). To prove the second prong of the legal-causation standard, the employee must prove that the hazards in his or her normal working environment were ‘peculiar hazards,’ i.e., hazards different in character than those found in the general run of occupations.
 
 Young v. City of Huntsville,
 
 342 So.2d 918, 921 (Ala.Civ.App.1976). The peculiar-risk standard is met if the employee presents sufficient evidence that he or she was exposed to a hazard in a substantially different manner than are persons in employment generally.
 
 Id.; see also Alatex, Inc. v. Couch,
 
 449 So.2d 1254 (Ala.Civ.App.1984).
 

 “The question as to whether an employee has been exposed to an increased and peculiar risk of contracting an occupational disease by the normal working conditions of the employment over a period of time is a question of fact. The decision of the trial court on this issue of fact must be based on a preponderance of the evidence as contained in the record of the hearing. Ala.Code 1975, § 25 — 5—81(c);
 
 see also VF Jeanswear v. Taylor,
 
 899 So.2d 1002 (Ala.Civ.App.2004) (declining to apply clear-and-convincing-evidence standard to occupational-disease claims).”
 

 ArvinMeritor, Inc. v. Handley,
 
 12 So.3d 669, 677 (Ala.Civ.App.2007) (opinion on return to remand).
 

 
 *843
 
 The employer specifically argues that Atterberry has not proven that he suffers from a disease associated with his particular occupation as an automobile de-tailer. However, § 25-5-110 does
 
 not
 
 limit occupational diseases only to those diseases, like byssinosis or silicosis, identified with a particular occupation. 1 Terry A. Moore,
 
 Alabama Workers’ Compensation
 
 § 9:7 (1998). Instead, chronic lung conditions like asthma and chronic obstructive pulmonary diseases can be compensable occupational diseases if an employee can establish both legal and medical causation under § 25-5-110.
 
 Id.
 
 at § 9:7 and § 9:10.
 

 The employer further argues that no doctor diagnosed Atterberry with any particular disease, much less one known to be an occupational disease. Dr. Dotson testified that Atterberry had “restrictive lung disease due to some type of interstitial process, fibrosis or inflammation, I’m not sure which.” When asked if Atterberry could be cured, Dr. Dotson stated that he was unsure of exactly what Atterberry had, but it appears that Dr. Dotson meant that he was not sure which process had caused Atterberry’s condition. In addition, Dr. Cooper agreed that Atterberry had interstitial lung disease caused, in Dr. Cooper’s opinion, by fibrosis, or scarring, that resulted from severe pneumonia. Dr. Cooper also referred to Atterberry’s condition as adult respiratory distress syndrome, which, he testified, resulted from Atterberry’s severe pneumonia. We cannot agree that the record does not contain sufficient evidence that Atterberry suffers from interstitial lung disease and adult respiratory distress syndrome.
 

 The employer next argues that, even assuming that Atterberry has a disease that could qualify as an occupational disease, Atterberry failed to prove that he was at an increased risk of contracting the disease as a result of exposure in his employment or that he was exposed to a peculiar hazard in his employment in a manner substantially different than employed persons, in general, are exposed.
 
 See ArvinMeritor,
 
 12 So.3d at 677 (opinion on return to remand). According to the employer, Atterberry failed to present evidence indicating that the chemicals to which he was exposed at the employer’s garage created an increased risk of his contracting a lung condition. The employer specifically references Dr. Cooper’s testimony that research did not support a link between exposure to the chemicals At-terberry was exposed to at work and the lung disease from which he suffers. In fact, although Dr. Dotson testified to his opinion that Atterberry’s condition was caused or aggravated by his exposure to the chemicals in the detergents and solvents used by Atterberry at work, nothing in Dr. Dotson’s testimony established a link between the exposure to the chemicals used in Atterberry’s work and his development of interstitial lung disease. Dr. Dotson did state that the chemicals used in the detergents and solvents Atterberry used were toxic to the lungs and that that they could get into the lungs
 
 if aerosol-ized.
 
 However, no evidence at trial indicated that the chemicals used in the detergents and solvents were aerosolized. Watts’s testimony, although indicating that Atterberry was exposed to certain hazardous chemicals in an amount materially in excess of the amount to which people are normally exposed in their everyday lives, did not establish the exposure levels in the garages in which Atterberry worked or provide evidence of a link between the exposure to such chemicals and the lung disease from which Atterberry suffers.
 

 
 *844
 
 We considered a similar situation recently in
 
 ArvinMeritor.
 
 12 So.3d at 677 (opinion on return to remand). The physician in
 
 ArvinMeritor
 
 had testified that the disease from which the employee suffered, polymyositis, was considered to be an idiopathic disorder, which indicated that the cause of the disease was undetermined; however, the physician opined that the employee’s exposure to certain chemicals in the workplace could have contributed to the onset of the disease.
 
 Id.
 
 at 684-85. We concluded that the testimony offered by the physician failed to establish that the employee suffered from an occupational disease. We stated that the physician’s testimony:
 

 “established that the medical community has not identified any causal link between chemical exposure and the contraction of polymyositis. In the absence of such a link, [the employee] could not establish that the presence of airborne chemicals in the Arvin workplace exposed him to a peculiar or increased risk of contracting polymyositis.”
 

 Id.
 
 at 685 (footnote omitted). We further noted that the physician’s testimony that the cause of polymyositis was unknown rendered his theory that chemical exposure could trigger the disease speculative; mere speculation cannot support a finding of fact.
 
 Id.
 

 Considering our analysis in
 
 ArvinMeritor,
 
 we must agree with the employer that Atterberry failed to prove that he contracted an occupational disease through exposure to chemicals at his workplace. Because the evidence presented by Atter-berry did not “identify] any causal link between chemical exposure and the contraction of [interstitial lung disease],” he could not establish that his exposure to chemicals in the employer’s garage exposed him to an increased risk of contracting interstitial lung disease. Without such proof, Atterberry’s interstitial lung disease cannot be considered to be an occupational disease.
 

 Whether Atterbeyry Established that He Had Suffered a Nonaccidental Injury
 

 We now turn to whether Atterber-ry established his alternative claim — that he suffered a nonaccidental injury in the course of and arising out of his employment. As noted above, Atterberry claims that exposure to chemicals over a period of time resulted in his lung condition.
 

 “As the company correctly argues, the worker, to succeed in her action for benefits, must establish causation — both medical and legal — by clear and convincing evidence.
 
 See
 
 Ala.Code 1975, § 25-5-81(e) (stating that cases involving a gradual deterioration or cumulative-physical-stress disorders require clear and convincing proof). To establish legal causation, because she suffered an ‘nonaceidental’ injury, the worker must present clear and convincing evidence that she was exposed to a ‘ “danger or risk materially in excess” of that danger to which all persons are ordinarily exposed in their everyday lives.’
 
 Ex parte Trinity Indus.[, Inc.],
 
 680 So.2d [262,] 269 [ (Ala.1996) ] (quoting
 
 City of Tuscaloosa v. Howard,
 
 [55 Ala.App. 701, 705,] 318 So.2d [729,] 732 [ (Civ.1975) ]). She must also establish medical causation by presenting clear and convincing evidence that such exposure ‘ “was in fact [a] contributing cause of the injury” for which benefits are sought.’
 
 Id.”
 

 WestPoint Stevens, Inc. v. Hill,
 
 851 So.2d 71, 75 (Ala.Civ.App.2002).
 

 To establish legal causation, Atter-berry was required to present clear and convincing evidence that he was exposed to a risk materially in excess of those risks to which we are all exposed in our everyday
 
 *845
 
 lives.
 
 Hill,
 
 851 So.2d at 75. The employer argues that Atterberry failed to show that he was exposed to any particular chemical in an amount sufficient to cause Atterberry’s lung condition. Atterberry, however, argues that the testimony of Watts and Dr. Dotson clearly and convincingly supports the trial court’s determination that Atterberry proved legal causation.
 

 Watts’s testimony, which was recounted above, contained, as the employer put it, “the magic words” indicating that Atter-berry was exposed to the chemicals used in the detergents and solvents to a degree materially in excess of the exposure we all encounter in our everyday lives. However, the employer takes issue with the factual underpinnings of Watts’s testimony, which it says it undermined on cross-examination. In fact, the employer contends that Watts’s testimony revealed that he did not know the amounts of the chemicals at issue in the detergents and solvents used at the employer’s garage or in the household products that Watts admitted contained the same chemical compounds.
 

 Watts did testify that household cleaning products and some food products contained some of the same chemicals Atter-berry claimed caused his lung condition. When asked on direct examination, Watts said that Atterberry’s exposure would have been materially in excess of the exposure of those persons using household cleaning products. However, when cross-examined, Watts admitted that he had not tested household cleaning products to determine the level of the various chemicals contained therein; he further admitted that, although he went to the employer’s garage, he did not perform any testing to determine the level of the chemicals present in the products used there. When confronted with the fact that Tiger Super Agent, in particular, contained less than five percent by weight of both 2-butox-yethanol and sodium hydroxide, Watts said that he could have determined the amount of each chemical in each detergent or solvent by looking at the MSDS for each detergent or solvent; however, Watts was forced to admit that he had not had the MSDS for each detergent or solvent when he first formed his opinion regarding At-terberry’s exposure.
 

 As noted above, the MSDS for some of the chemicals at issue, in their concentrated form, indicated that they posed a risk of upper-respiratory effects if inhaled. However, the MSDS for Tiger Super Agent itself did not indicate that the compound posed any respiratory hazards. Although the MSDS for Tiger Super Agent indicated that use of respiratory protection would be necessary if the TLV of any component chemical were exceeded, no evidence established that those levels were exceeded. In fact, no evidence established the levels of any of the chemicals used in the detergents and solvents at the employer’s garage.
 

 Dr. Dotson’s testimony, which was also recounted above, described the chemicals to which Atterberry was exposed as toxic to the lungs. He further indicated that the chemicals could reach the lungs if they were aerosolized. However, as we have already noted, no evidence indicates that the chemicals Atterberry was exposed to were aerosolized.
 

 We agree with the employer that Atter-berry failed to produce evidence from which a finder of fact could form a firm conviction that Atterberry proved legal causation of his lung condition. In so concluding, we are mindful that we are not permitted to reweigh the evidence before the trial court. Instead, we have concluded that the evidence could not be “ ‘reasonably ... [found] to clearly and convincingly [as “clear and convincing” is defined by
 
 *846
 
 § 25-5-81(c) ] establish the fact sought to be proved.’ ”
 
 Ex parte McInish,
 
 — So.3d at- (quoting
 
 KGS Steel,
 
 — So.3d at •- (Murdock, J., concurring in the result)). The evidence, when viewed in its entirety, cannot be said to create a firm conviction that Atterberry’s exposure to the chemicals used in the detergents and solvents at the employer’s garage was materially in excess of the exposure to those same chemicals others face in their everyday lives. Although Watts testified that Atterberry’s exposure was materially in excess of that of the general population, his testimony indicated that he had no factual basis for making that conclusion because he had not determined the actual amount of exposure Atterberry suffered and had not compared Atterberry’s exposure to the exposure persons suffer when using household cleaning products containing the same chemicals. Thus, the trial court’s judgment concluding that Atterber-ry suffered a nonaccidental injury must be reversed.
 
 [3]
 

 The employer also contests the trial court’s award of costs to Atterberry.
 

 “Under [Ala.Code 1975,] § 25-5-89, ‘“[tjaxing of costs [in a workers’ compensation case] is a matter within the trial court’s discretion.” ’
 
 Ex parte Ellenburg,
 
 627 So.2d 398, 400 (Ala.1993) (quoting
 
 Universal Forest Prods. v. Ellenburg,
 
 627 So.2d 395, 397 (Ala.Civ.App.1992)). The trial court’s discretion is subject to Rule 54(d), Ala. R. Civ. P, which states: ‘Except when express provision therefor is made in a statute, costs shall be allowed as of course to the prevailing party unless the court otherwise directs....’”
 

 Ex parte Gulf States Steel, Inc.,
 
 772 So.2d 1122, 1124 (Ala.2000). In light of our reversal of the trial court’s judgment determining Atterberry’s lung condition to be compensable, we reverse the award of costs to Atterberry.
 

 REVERSED AND REMANDED.
 

 THOMPSON, P.J., and PITTMAN and BRYAN, JJ., concur.
 

 MOORE, J., concurs in the result, without writing.
 

 [1]
 

 . In the record, the employer is referred to in the pleadings as “Greater Mobile Chrysler Plymouth Jeep, a corporation.” The docketing statement for the appeal, however, lists the employer as Greater Mobile Chrysler-Jeep, Inc. According to the Alabama secretary of state, the employer changed its name in March 2002 from "Greater Mobile Chrysler-Plymouth-Jeep, Inc.,” to "Greater Mobile Chrysler-Jeep, Inc.”
 

 [2]
 

 . Atterberry referred to the product as “Tiger Degreaser”; however, the Material Safety Data Sheet in the record refers to the product as "Tiger Super Agent.” We assume the two references are to the same product, and we will therefore refer to the product as "Tiger Super Agent.”
 

 [3]
 

 . Because we have concluded that Atterberry failed to establish legal causation, we need not consider whether he proved clearly and convincingly that his lung condition was caused by the exposure to the chemicals used in the detergents and solvents at the employer’s garage.